Cynthia LOVE, Plaintiff,

v.

DELTA AIR LINES, Defendant.

No. CIV. A. 00–D–676–N.

United States District Court,
M.D. Alabama,
Northern Division.

Oct. 12, 2001.

Charles A. Everage, Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for James Willis Garrett, Jr., Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for Defendant.

Letta D. Gorman, Letta Dillard Gorman, Attorney at Law, Montgomery, for Plaintiff.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are the following Motions: 1) a Motion For Summary Judgment, filed July 13, 2001, by Delta Air Lines, Inc. ("Defendant") and 2) a Motion For Summary Judgment, filed July 17,

2001, by Cynthia Love ("Plaintiff"). The parties have filed briefs and evidentiary submissions in support of and in opposition to the respective Motions. After careful consideration of the arguments of the parties, the relevant law, and the record as a whole, the court finds that Defendant's Motion is due to be denied in part and granted in part, and Plaintiff's Motion is due to be denied.

## I. JURISDICTION AND VENUE

The court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment can be entered on a claim only if the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As to materiality, substantive law determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* As to genuineness, a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.; see also Barfield v. Brierton*, 883 F.2d 923, 933

(11th Cir.1989). "In assessing whether the movant has met [its] burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir.1997) (citations omitted).

## III. BACKGROUND

Plaintiff has had Polio since the age of three and is paralyzed.[1] She is constrained to a wheelchair and has no ability to stand or walk.[2] Plaintiff's cause of action arises from events occurring on May 26, 1998, during a flight on Defendant airline from Montgomery, Alabama to Colorado Springs, Colorado.[3] When making reservations prior to the flight, Plaintiff notified Defendant of her " 'special needs.' "[4] During the flight, Plaintiff became ill and had to be carried to the restroom by her son.[5]

Plaintiff claims Defendant "engaged in a discriminatory practice with reckless indifference to [her] federally protected rights."[6] The federally protected rights referred to in the complaint are those provided under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, and the Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705.[7] Generally, Plaintiff claims Defendant failed to provide Plaintiff with reasonable accommodations and access to services and facilities.[8] More specifically, Plaintiff claims Defendant failed to provide an accessible "call button" for Plaintiff to page the flight at-

---

1. Pl.'s Answers To Limited Interrogs. And Req. For Produc. of Docs., ¶ 2.

2. *Id.*

3. Compl., ¶ 12; Affidavit of Greg Carroll ("Carroll Aff."), ¶ 7.

4. *Id.*, ¶ 13; Pl.'s Answers To Second Interrogs. And Req. For Produc. Of Docs., ¶ 2D.

5. Compl., ¶ 16.

6. *Id.*, ¶ 19.

7. *Id.*, ¶¶ 1, 9, 10.

8. *Id.*, ¶¶ 9–19.

tendant;[9] that Defendant failed to provide an aisle chair to assist her in accessing the restroom facilities;[10] that the restroom was too small to accommodate Plaintiff;[11] that Plaintiff was not provided privacy in the restroom;[12] and that Defendant failed to provide adequately trained flight personnel.[13]

## IV. DISCUSSION

As stated, Plaintiff brings claims under the ADA and the ACAA. The court addresses each claim separately.

### A. *The Americans With Disabilities Act*

■ While not raised by Defendant, it is clear that Plaintiff cannot maintain a claim under the ADA because aircraft are not covered under Title III of the ADA. Plaintiff's allegations fall under Title III of the ADA—Public Accommodations And Services Operated By Private Entities, 42 U.S.C. §§ 12181–12189, and the regulations promulgated thereunder.[14] Title III of the ADA prohibits discrimination in commercial facilities, places of public accommodation, and specified public transportation. 42 U.S.C. §§ 12181–12184.

Title 28, Part 36 of the Code of Federal Regulations implements Title III of the ADA. Plaintiff argues that 28 C.F.R. § 36.303 requires Defendant in this case to provide to Plaintiff an on-board aisle chair, access to a call button, an accessible restroom, privacy in the restroom, and adequately trained flight personnel.[15]

When a court interprets a statute, "the plain meaning of the statute controls unless the language is ambiguous or leads to

absurd results." *U.S. v. McLymont*, 45 F.3d 400, 401 (11th Cir.1995). Airlines are not included in the statutory definitions of "commercial facilities," 42 U.S.C. § 12181(2), or "public accommodation," 42 U.S.C. § 12181(4). In addition, aircraft are expressly excepted from the statutory definition of "specified public transportation," 42 U.S.C. § 12181(10).

Applying the plain meaning of the statute, the court finds that aircraft are exempted from Title III of the ADA. Accordingly, Plaintiff's claims based on violations of Title III of the ADA, 42 U.S.C. §§ 12182–12189, or any regulations promulgated thereunder, are due to be dismissed.

### B. *The Air Carrier Access Act*

#### 1. *Subject Matter Jurisdiction*

As a threshold matter, the court raises *sua sponte* the issue of subject matter jurisdiction over Plaintiff's claims under the ACAA. As federal courts are courts of limited jurisdiction, any order by a federal court lacking subject matter jurisdiction, other than an order of dismissal or remand, is void. *See Christopher v. Stanley–Bostitch, Inc.*, 240 F.3d 95, 100 (1st Cir.2001); *Shirley v. Maxicare Texas, Inc.*, 921 F.2d 565, 568 (5th Cir.1991). Thus, the court "must inquire into ... subject matter jurisdiction sua sponte even if the parties have not challenged it." *Rembert v. Apfel*, 213 F.3d 1331, 1333–34 (11th Cir.2000) (citations omitted).

The issue of subject matter jurisdiction arises in the context of whether there is a

---

9. *Id.*, ¶ 15.

10. *Id.*, ¶ 17.

11. *Id.*, ¶ 18.

12. *Id.*, ¶ 18.

13. *Id.*, ¶ 21.

14. Pl.'s Answers To Second Interrogs. And Req. For Produc. Of Docs., ¶ 2B.

15. Pl.'s Br. In Supp. Of Pl.'s Mot. For Summ. J. And In Opp'n To Def.'s Mot. For Summ. J. ("Pl.'s Br."), at 3.

private cause of action available under the ACAA. The ACAA, 49 U.S.C. § 41705, provides that an air carrier "may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities; (2) the individual has a record of such impairment; (3) the individual is regarded as having such an impairment." No private cause of action is expressly mentioned in the ACAA. Thus, whether Plaintiff can bring an action under the ACAA is contingent upon there being an implied private cause of action for violations of the ACAA.

### a. Implied Private Causes Of Action—Generally

The court first addresses the genesis of the treatment of implied private causes of action by the United States Supreme Court. Beginning in 1975, courts applied the four factor implied cause of action analysis established in the case of *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[16] However, the *Cort v. Ash* analysis has been extensively criticized by members of the U.S. Supreme Court.

In *Cannon v. University of Chicago*, Justice Powell's dissent traced the advent of cases that led to the *Cort* decision, discussed the decision itself, and the implications of the decision. 441 U.S. 677, 730–49, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting). Justice Powell noted that *Cort* was decided "against [a] background of almost invariable refusal to imply private actions, absent a complete failure of alternative enforcement mechanisms and a clear expression of legislative intent to create such a remedy." *Id.* at 739, 99 S.Ct. 1946. The purpose of the *Cort* analysis, according to Justice Powell, was to determine "whether Congress intended to provide a private cause of action." *Id.* at 739–40, 99 S.Ct. 1946. However, Justice Powell noted, "the *Cort* analysis too easily may be used to deflect inquiry away from the intent of Congress, and to permit a court instead to substitute its own views as to the desirability of private enforcement." *Id.* at 740, 99 S.Ct. 1946. Justice Powell continued, "[o]f the four factors mentioned in *Cort*, only one refers expressly to legislative intent. The other three invite independent judicial lawmaking." *Id.* Justice Powell noted that from the time the *Cort* decision was rendered until 1979, the Supreme Court consistently turned its back on attempts to create private actions, finding no implied cause of action in four cases, while at the same time the United States Courts of Appeals went in the opposite direction, with at least twenty decisions finding private causes of action implied in federal statutes. *Id.* at 741, 99 S.Ct. 1946. The decision in *Cort*, argued Powell, violates the doctrine of separation of powers and Article III of the Constitution, allowing the "Judicial Branch to assume policymaking authority vested in the Legislative Branch." *See id.* at 743–49, 99 S.Ct. 1946.

---

**16.** The four factors in the *Cort v. Ash* analysis are as follows:

First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,'—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. 2080 (citations omitted).

Justice Powell's dissenting opinion in *Cannon* was echoed in Justice Scalia's concurring opinion in *Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988). Justice Scalia stated that

> [i]t could not be plainer that we effectively overruled the *Cort v. Ash* analysis in *Touche Ross & Co., v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82, (1979), and *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), converting one of its four factors (congressional intent) into *the determinative factor*, with the other three merely indicative of its presence or absence.
>
> . . . .
>
> The recent history of our holdings is one of repeated rejection of claims of an implied right. This has been true in 9 of 11 recent private right of action cases heard by this Court, including the instant case.

*Thompson*, 484 U.S. at 189–80, 108 S.Ct. 513 (Scalia, J., concurring). Scalia quoted from Justice Powell's dissent in *Cannon*:

> Under Art. III, Congress alone has the responsibility for determining the jurisdiction of the lower federal courts. As the Legislative Branch, Congress also should determine when private parties are to be given causes of action under legislation it adopts. As countless statutes demonstrate, including Titles of the Civil Rights Act of 1964, Congress recognizes that the creation of private actions is a legislative function and frequently exercises it. When Congress chooses not to provide a private civil remedy, federal courts should not assume the legislative role of creating such a remedy and thereby enlarge their jurisdiction. (Footnote omitted).

*Id.* at 191, 108 S.Ct. 513.

Scalia proceeded to point out that

it is not beyond imagination that in a particular case Congress may intend to create a private right of action, but chooses to do so by implication. One must wonder, however, whether the good produced by a judicial rule that accommodates this remote possibility is outweighed by its adverse affects. An enactment by implication cannot realistically be regarded as the product of the difficult lawmaking process our Constitution has prescribed. . . . It is at best dangerous to assume that all the necessary participants in the law-enactment process are acting upon the same unexpressed assumptions. And likewise dangerous to assume that, even with the utmost self-discipline, judges can prevent the implications they see from mirroring the policies they favor.

*Id.* at 191–92, 108 S.Ct. 513.

■ The culmination of the judicial distaste of implied private causes of action came to the majority of the United States Supreme Court in *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). In *Alexander*, the majority of the Court took the following position:

> [l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether or not it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. "Raising up causes of action where a statute has not created them may be a proper function for common law courts, but not for federal tribunals."

*Id.,* 121 S.Ct. at 1519–20 (citations omitted). In *Alexander,* the Supreme Court refused to find an implied cause of action from regulations that exceeded the statutory language under which they were enacted. *Id.,* 121 S.Ct. at 1520–23. For the purposes of the current case, however, the important part of the dissenting opinion in *Cannon,* the concurring opinion in *Thompson,* and the majority opinion in *Alexander,* is that the availability of implied private causes of action in federal statutes is to be determined by legislative intent, and, while not prohibited by the Court, implied private causes of action are disfavored by it.

### b. Implied Causes of Action— Under the ACAA

Turning specifically to the ACAA, only two circuit courts of appeals have directly discussed the issue of whether a private cause of action is available under the ACAA.

In *Tallarico v. Trans World Airlines, Inc.,* the Eighth Circuit Court of Appeals applied the four-factor analysis of *Cort v. Ash.* 881 F.2d 566, 568–70 (8th Cir.1989). In analyzing what the Supreme Court has now delineated as the determinative factor, legislative intent, the Eighth Circuit deduced that the ACAA was enacted in response to the Supreme Court's holding in *United States Department of Transportation v. Paralyzed Veterans of America,* 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986). 881 F.2d at 569–70. In *Paralyzed Veterans of America,* the Supreme Court held that § 504 of the Rehabilitation Act of 1973 applied only to airlines receiving direct federal assistance. *Id.* The *Tallarico* court reasoned that Congress reacted to the Supreme Court's holding in *Paralyzed Veterans of America* by amending the Federal Aviation Act of 1958 to prohibit discrimination against disabled individuals on all airlines, and that the

ACAA was patterned after the Rehabilitation Act of 1973, which had been held to imply a private cause of action. *Id.* at 570. Thus, the court held that " 'Congress implicitly intended that handicapped persons would have an implied cause of action to remedy perceived violations of the [ACAA].' " *Id.*

On the issue of damages, the *Tallarico* court held that the ACAA was akin to 42 U.S.C. § 1982, 42 U.S.C. § 1983, and the Fair Housing Act, under which emotional distress damages are compensable. *Id.* at 570–71. The court, therefore, allowed damages for emotional distress under the ACAA. *Id.* at 571. However, the *Tallarico* court declined to rule on whether punitive damages are available under the ACAA, holding that the plaintiff had not presented evidence sufficient to support an award of punitive damages. *Id.* at 572.

In *Shinault v. American Airlines,* the Fifth Circuit Court of Appeals likewise followed the *Cort v. Ash* analysis, but focused even more rigorously on the legislative intent, holding that "[t]he touchstone for deciding whether a statute provides a particular remedy is congressional intent." 936 F.2d 796, 800–01 (5th Cir.1991). The court in *Shinault* found that "Congress adopted § 404 of the Federal Aviation Act [ ("FAA") ] of 1958 to address discrimination against [individuals] by the [airline] industry." *Id.* at 801. Section 404(b) of the FAA prohibited air carriers from " 'subject[ing] any particular person ... to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.' " *Id.* The court also noted that the Ninth Circuit Court of Appeals "used § 404(b) as a basis for implying a private cause of action" to allow a disabled individual to bring suit against a commercial airline (citing *Hingson v. Pacific Southwest Airlines,* 743 F.2d 1408, 1411–12 (9th Cir.1984)). *Id.* However, the

court explained that " § 404(b) of the Federal Aviation Act was repealed by the Airline Deregulation Act of 1978." *Id.* at 802.

The court further found that in 1973, Congress enacted § 504 of the Rehabilitation Act to provide further protection for disabled individuals from discrimination " 'under any program or activity receiving federal financial assistance ....' " *Id.* at 801. The court recognized, however, that in 1986, the Supreme Court, in *Paralyzed Veterans of America,* held that § 504 of the Rehabilitation Act did not apply to all airlines because they did not all receive direct federal financial assistance. *Id.* at 801–02. Therefore, the court found that as a result 1) of the repeal of § 404(b) of the Federal Aviation Act and 2) the Supreme Court's decision in *Paralyzed Veterans of America,* disabled individuals had no protection from discrimination by commercial airlines. *Id.* at 802. The court recognized that Congress responded to the Supreme Court's decision in *Paralyzed Veterans of America* by passing the ACAA in 1986, "hoping to prevent the 'humiliating and degrading' practices of airlines." *Id.*

The court declined to follow the Eighth Circuit Court of Appeals in *Tallarico* by comparing the ACAA to other federal anti-discrimination statutes. *Id.* at 803–04. Finding "no significant evidence in the legislative history" or "in the circumstances surrounding the passage of the ACAA to indicate what types of remedies Congress intended to provide for private litigants," the court turned to "a well-established canon of statutory construction: '[t]he existence of a statutory right implies the existence of all necessary and appropriate remedies.' " *Id.* at 804. Thus, the court held that "[b]ecause Congress did not limit the available remedies under the ACAA, ... Congress intended to allow private plaintiffs to recover all necessary and appropriate remedies." [17] *Id.*

### c. Findings

■ The court agrees with the Eight Circuit Court of Appeals in *Tallarico* that the legislative history and the circumstances surrounding the enactment of the ACAA imply the existence of a private cause of action under the statute. Despite the Supreme Court's current disfavor of implied private causes of action, the court finds for the following reasons that the ACAA is one of the rare statutes in which a private cause of action was intended by the legislature, but the words were left out of the Act.

First, after the Airline Deregulation Act of 1978 repealed § 404(b) of the Federal Aviation Act, and the Supreme Court held in *Paralyzed Veterans of America* that § 504 of the Rehabilitation Act of 1973 did not apply to air carriers, the only sanction available against air carriers for discrimination against disabled individuals was a $1,000 fine imposed in favor of the United States.[18] In enacting the ACAA, the court presumes that Congress was aware of the status of the law, and was not satisfied with the absence of a private remedy to

---

**17.** The court interpreted *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and *Davis v. Passman,* 442 U.S. 228, 229, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), as a mandate to "look for an 'explicit congressional declaration that persons injured [in violation of federal law] may not recover money damages.' " *Shinault,* 936 F.2d at 804.

**18.** At the time the ACAA was enacted, an air carrier was liable to the United States for discriminating against disabled individuals for a fine of up to $1,000 per violation. Pub.L. 87–528, § 404(a) (1962). However, the Civil Aeronautics Board was required to provide notice and an opportunity for a hearing and a written notice of violation before assessing a penalty. Pub.L. 95–504, § 35(a) (1978).

deter discrimination by air carriers against disabled passengers. *See Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law"). Indeed, the legislative history clearly shows that Congress intended the ACAA to be remedial, fixing the gap left in the Rehabilitation Act by the Supreme Court's holding in *Paralyzed Veterans of Am.*, by providing disabled individuals access to commercial air carriers and by prohibiting unjust discrimination against disabled individuals by commercial air carriers. 132 Cong. Rec. S11784–08 (daily ed. Aug. 1, 1986) (statements of Sen. Dole and Sen. Cranston). A letter from the Department of Justice to Senator Dole stated that the Department of Justice wholeheartedly supported the bill, and noted that the bill was "amend[ing] the Federal Aviation Act of 1958 to prohibit air carriers from discriminating against qualified handicapped persons, because of their handicap, in the provision of air transportation." 132 Cong. Rec. S11784–08, (daily ed. Aug. 1, 1986) (Exhibit 1, Letter From U.S. Department of Justice).

Second, further evidence that the ACAA was enacted to redress discrimination against disabled individuals was provided by Senator Metzenbaum, who stated that

> [o]ver the years, the Department of Transportation has received numerous complaints about discriminatory treatment of handicapped persons by different commercial airlines....
>
> We have come a long way from the days when it was acceptable to treat persons with disabilities as second class citizens. Congress must act now to ensure that handicapped persons are not subjected to humiliating and degrading regulations or practices by any commercial air carrier or its personnel.

132 Cong. Rec. S11784–08, (daily ed. Aug. 1, 1986) (statement of Sen. Metzenbaum). *See also* 132 Cong. Rec. H7193–02 ("The bill now before us ... will make it clear that airlines may not discriminate against handicapped persons") (Statement of Rep. Mineta).

Based on the foregoing, it is difficult to imagine that Congress could have had any intention in creating this legislation other than to provide a private cause of action to redress discrimination against disabled individuals. Accordingly, the court finds that an implied private cause of action exists under the ACAA.

■ The more difficult issue is determining the types of remedies Congress intended to provide individuals under the ACAA. Senator Dole, the sponsor of S. 2703, which eventually became the ACAA, stated the following:

> In fashioning remedial legislation two alternative approaches have been considered. The first was to add air carriers specifically to the coverage of section 504. Although this approach was simple and direct, substantial objections were posed by representatives of air carriers as well as those concerned with Grove City legislation. Once the scope of the legislation was expanded beyond those receiving direct assistance, the list [of those regulated under § 504] could become endless. Also, the airlines strongly felt that they should continue to be regulated under the control of the Aviation Act as the legislation providing the basic regulatory authority for their industry.
>
> For awhile it seemed that it would not be possible to reconcile these differences; however, a compromise has been reached and is reflected in S. 2703. This is now incorporated into the legisla-

tion which amends the Aviation Act and incorporates compromise definitions which rely heavily on language and precedents from the Rehabilitation Act. The bill also adds terminology from the FAA regulations and the Aviation Act.

132 Cong. Rec. S11784–08 (daily ed. Aug. 15, 1986) (statement of Sen. Dole).

In determining the remedies available under the ACAA, the court will address three issues. First, the court will address the Rehabilitation Act, on whose "language and precedents" the compromise definitions heavily rely. Second, the court will address the Federal Aviation Act, which "also adds terminology" to the ACAA, and into which the ACAA was enacted. Third, the court will address the ADA, the primary statute prohibiting discrimination against disabled individuals, because the ACAA is similar in that it was enacted to prevent discrimination against disabled persons by commercial airlines.

First, the court looks to the language and precedents of the Rehabilitation Act. Section 504 of the Rehabilitation Act, now codified at 29 U.S.C. § 794, provided that:

> [n]o otherwise qualified handicapped individual in the United States, …, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

Pub.L. 93–112, Title V, § 504, 87 Stat. 355, 394 (1973), as amended by Pub.L. 95–602, Title I, § 119, 92 Stat. 2982, 2987 (1978). In ascertaining the remedies available under the ACAA, the Fifth Circuit Court of Appeals in *Shinault* looked to the Rehabilitation Act for guidance. The *Shinault* court noted that when the ACAA was enacted, it was "settled law" that injunctive relief, declaratory relief, and backpay were available under the Rehabilitation Act, but that courts were divided as to an individual's entitlement to compensatory damages under the Rehabilitation Act. 936 F.2d at 803 (citations omitted). The *Shinault* court, however, declined to use the Rehabilitation Act as a guide because of the unsettled status of the availability of compensatory damages. Instead, as previously stated, the court held that because the legislative history and the circumstances surrounding the passage of the ACAA did not indicate what remedies Congress intended to make available under the ACAA, the court should "fall back on a well-established canon of statutory construction: 'The existence of a statutory right implies the existence of all necessary and appropriate remedies.'" 936 F.2d at 804 (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969)). Therefore, the court held, "[b]ecause Congress did not limit the available remedies under the ACAA, … Congress intended to allow private plaintiffs to recover all necessary and appropriate remedies," including compensatory damages. *Id.* at 804. When the Fifth Circuit Court of Appeals decided *Shinault*, however, the Supreme Court's decision in *Alexander, supra*, had not yet been rendered. *Alexander* does not appear to support the application of such an expansive rule of statutory construction. *See Alexander*, 121 S.Ct. at 1520 (providing that " '[r]aising up causes of action where a statute has not created them may be a proper function for common law courts, but not for federal tribunals.' ")

Second, the court addresses the Federal Aviation Act of 1958. Section 404(b) of the FAA prohibited air carriers from " 'subject[ing] any particular person … to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in

any respect whatsoever.'" *Shinault,* 936 F.2d at 801. The court in *Hingson v. Pacific Southwest Airlines* found that

> [s]ection 404(b) creates a private cause of action for passengers who suffer unjust discrimination or unreasonable prejudice. Handicapped passengers who are injured by unreasonable discrimination or prejudice on the part of air carriers may recover compensatory damages under section 404(b). Moreover, punitive damages are recoverable if the defendant has acted "wantonly, or oppressively, or with such malice as implies a spirit of mischief or criminal indifference to civil obligations."

743 F.2d 1408, 1411–12 (9th Cir.1984) (citations omitted). However, as previously stated, § 404(b) of the FAA was repealed by the Airline Deregulation Act of 1978. Pub.L. 95–504, Oct. 24, 1978, 92 Stat. 1705. Obviously, Congress did not immediately react to the Airline Deregulation Act of 1978, because Congress believed that, under the law at that time, disabled individuals were still protected from discrimination by airlines pursuant to § 504 of the Rehabilitation Act. The knee-jerk reaction of Congress came after the Supreme Court held that § 504 of the Rehabilitation Act did not apply to all air carriers. Thus, the court finds that Congress, in creating the ACAA, was not trying to reinstate the previous § 404(b) of the FAA that allowed for private causes of action to obtain compensatory, and, where warranted, punitive damages. Congress had been satisfied with the remedies available under § 504 of the Rehabilitation Act from 1978 until 1986. Therefore, the court finds that Congress intended the remedies for violations of the ACAA to be more akin to those available under § 504 of the Rehabilitation Act than those that were available under the previous § 404(b) of the FAA. in this

respect, the court disagrees with the holding of the *Tallarico* court that the remedies available under the ACAA were more akin to those available under § 1982, § 1983, and the FHA, which allowed recovery for emotional distress.

Third, the court finds that Congress' subsequent statutes created to prohibit discrimination against disabled individuals, particularly the ADA, to be instructive. As discussed above, Congress intentionally left aircraft out of the ADA.[19]

It is clear that air carriers were excluded from coverage under the ADA because of the existence of the ACAA. The Senate Committee on Labor and Human Resources, in S. Rep. 101–116, provided that "[t]he Committee excluded transportation by air because the Congress recently passed the Air Carriers Access Act, which was designed to address the problem of discrimination by air carriers and it is the Committee's expectation that regulations will be issued that reflect congressional intent." S. Rep. 101–116 (1989) (to accompany S. 933). Similarly, the House Committee on Public Works and Transportation stated that "[t]he Committee excluded transportation by aircraft because of the existence of the Air Carrier Access Act of 1986 (Pub.L.99–435)." H.R. Rep. 101–485(I) (1990), U.S.Code Cong. & Admin.News 1109, pp. 267, 280. Likewise, the House Committee on Education and Labor stated that "[t]he Committee excluded transportation by air because the Congress recently passed the Air Carriers Access Act, which was designed to address the problem of discrimination by air carriers and it is the Committee's expectation that regulations will be issued that reflect congressional intent." H.R. Rep. 101–485(II) (1990), U.S.Code Cong. & Admin.News 1990, pp. 303, 369. Based on

---

**19.** *See supra,* section III(A)—Discussion— Americans With Disabilities Act.

the foregoing, it is clear that Congress did not prohibit air carriers from discriminating against disabled individuals under the ADA because Congress considered that air carriers were already prohibited from doing so by the ACAA.

Section 12188 of the ADA provides that "[t]he remedies and procedures set forth in section 2000a–3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination . . . ." The remedies provided in § 2000a–3(a) are for preventive injunctive relief only.[20] 42 U.S.C. § 2000a–3(a). The ADA was passed in 1990, and the ACAA was passed in 1986. If Congress had desired to create additional remedies for the ACAA than the ADA, it could certainly have done so when it passed the ADA, or any time subsequent thereto. This is evidenced by the recent passage of the Wendell H. Ford Aviation Investment and Reform Act For The 21st Century ("FAIR 21"); passed April 5, 2000. Pub.L. 106–181, 114 Stat 61.

The bill that eventually became the law was originally H.R. 1000. When the Senate addressed the bill, it made the following changes, among others:

SEC. 407. HIGHER STANDARDS FOR HANDICAPPED ACCESS.

. . . .

(c) INCREASED CIVIL PENALTIES.—Section 46301(a) is amended—

(1) by inserting "41705," after "41704," in paragraph (1)(A); and

(2) by adding at the end thereof the following:

(7) VIOLATION OF SECTION 41705.—

(A) CREDIT; VOUCHER; CIVIL PENALTY.—Unless an individual accepts a credit or voucher for the purchase of a ticket on an air carrier or any affiliated air carrier for a violation of subsection (a) in an amount (determined by the Secretary) of—

(i) not less than $500 and not more than $2,500 for the first violation; or

(ii) not less than $2,500 and not more than $5,000 for any subsequent violation, then that air carrier is liable to the United States Government for a civil penalty, determined by the Secretary, of not more than 100 percent of the amount of the credit or voucher so determined.

(B) REMEDY NOT EXCLUSIVE.- Nothing in subparagraph (A) precludes or affects the right of persons with disabilities to file private rights of action under section 41705 or to limit claims for compensatory or punitive damages asserted in such cases.

(C) ATTORNEY'S FEES.—In addition to the penalty provided by subparagraph (A), an individual who—

(i) brings a civil action against an air carrier to enforce this section; and

(ii) who is awarded damages by the court in which the action is brought, may be awarded reasonable attorneys' fees and costs of litigation reasonably incurred in bringing the action if the court deems it appropriate.

145 Cong. Rec. S12115–02, S12121, (daily ed., Oct. 6, 1999). The bill that was reported out of the Conference Committee, however, omitted the Senate's paragraph (7)—Violation of Section 41705, which provided for compensatory and punitive damages and attorney's fees for violations of 49

---

**20.** In *Jairath v. Dyer,* the Eleventh Circuit Court of Appeals stated that "[a]lthough a private right of action for injunctive relief does exist under the ADA, it is uncontested that there is no private right of action for damages." 154 F.3d 1280, 1283 (11th Cir. 1998).

U.S.C. § 41705. The Report of the Conference Committee provided the following:

128. INTERNATIONAL STANDARDS FOR HANDICAPPED ACCESS

House Bill

Section 706(c): Directs DOT to work with international organizations to improve access for handicapped passengers especially on foreign airlines that code-share with U.S. carriers. Extends the existing prohibition on discrimination to foreign airlines operating to the U.S. subject to bilateral obligations under section 40105(b). Imposes a penalty of $10,000 for violations.

Senate Amendment

Section 407: Directs DOT to work with international organizations to improve access for handicapped passengers especially on foreign airlines that codeshare with U.S. carriers. Extends the existing prohibition on discrimination to foreign airlines operating in U.S. Each act of discrimination constitutes a separate violation. Each complaint shall be investigated and complaint statistics shall be publicly reported. Annual report to Congress. The government shall provide technical assistance to airlines and disabled people. Adds the section prohibiting discrimination against the handicapped to those subject to the $1,000 civil penalty. If the carrier that discriminated does not provide a credit or voucher to the passenger in the specified amounts, then the penalty will be that specified amount. Attorney's fees may be awarded if the court deems it appropriate.

Conference Substitute

Section 707: Senate provision insofar as it (1) directs DOT to work with international organizations to improve access for handicapped passengers especially on foreign airlines that code-share with U.S. carriers; (2) extends the existing prohibition on discrimination of foreign airlines operating to the U.S.; (3) states that each act of discrimination constitutes a separate violation; (4) requires that each complaint be investigated and complaint statistics be publicly reported; (5) mandates an annual report to Congress; and (6) requires that technical assistance be provided to airlines and disabled people. Civil penalties for violations are increased to $10,000. The extension of the prohibition on discrimination to foreign airlines is made subject to U.S. bilateral obligations as in the House bill.

146 Cong. Rec. H649–04, H697 (daily ed. October 6, 1999) (codified at 49 U.S.C. § 46301).

The court realizes that any argument based on what Congress did not do is not definitive. Congress may have originally intended to provide a private cause of action for compensatory and/or punitive damages, and the Senate, in its version of FAIR 21, may have been trying to clarify what was originally intended by Congress under the statute. However, the statute, as passed, did not include the Senate's amendments, and therefore did not explicitly provide for a private cause of action allowing compensatory or punitive damages for a violation of the ACAA (§ 41705). Conversely, the Senate, in its version of FAIR 21, may have seen a need for a private cause of action that allowed for compensatory and punitive damages for violations of the ACAA, and may therefore have been attempting to enact a provision allowing for such damages. Thus, it could be said that Congress, in declining to include the Senate's version of FAIR 21, declined to provide a monetary damages remedy for violations of the ACAA. Such a conclusion would be consistent with the court's reasoning based on the legislative

history of the ACAA, § 504 of the Rehabilitation Act, the FAA, and the ADA.

 In sum, the court finds that in this case, Plaintiff has a private implied cause of action against Defendant under the ACAA for injunctive relief and declaratory relief,[21] and the court has federal subject matter jurisdiction according to 28 U.S.C. § 1331 (federal question jurisdiction) and 49 U.S.C. § 41705 (the ACAA). It is well-settled law that the Seventh Amendment right to a trial by jury does not apply to suits seeking only injunctive relief. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 719, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). However, a jury trial is available on factual issues underlying a declaratory action. *Guajardo v. Estelle*, 580 F.2d 748, 752 (5th Cir.1978) (citing 5 J. Moore, Federal Practice P 38.29). Thus, Plaintiff's jury demand remains valid in this case.

### 2. ACAA Substantive Law And Regulations Enacted Thereunder

The Air Carrier Access Act was created in 1986. Act of October 2, 1986, Pub.L. 99–435, 100 Stat. 1080. As previously stated, the ACAA was intended to amend the Federal Aviation Act of 1958 to prohibit air carriers from discriminating against disabled individuals. *Id.* As originally enacted, section three of the ACAA required the Secretary of Transportation to "promulgate regulations to ensure non-discriminatory treatment of qualified handicapped individuals ...." *Id.*, at § 3. "An agency regulation has the force and effect of law

... if it is authorized by congressional grant of authority ...." *Nieman v. Dryclean U.S.A. Franchise Co., Inc.*, 178 F.3d 1126, 1129 (11th Cir.1999) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 60 L.Ed.2d 208, (1979)).

Amendments enacted in 1994 provided the current version of the ACAA, 49 U.S.C. § 41705, which, as previously stated, provides that an air carrier "may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities; (2) the individual has a record of such impairment; (3) the individual is regarded as having such an impairment."

The Department of Transportation continues to promulgate regulations to assist in implementing the Act. The regulations are located in Title 14, part 382 of the Code Of Federal Regulations.

 The next issue under the ACAA that the court must address is the interrelationship between statutory interpretation and the federal agency assigned to promulgate rules according to the statute. The leading case on the subject is *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The *Chevron* analysis requires the court to begin by inquiring as to whether or not the statute makes the congressional purpose clear as to the question at issue. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *Dawson v. Scott*, 50 F.3d 884, 886 (11th Cir.

---

**21.** The Eleventh Circuit "has held that plaintiffs who proceed under a theory of disparate treatment in section 504 actions must prove intentional discrimination or bad faith in order to recover compensatory damages." *Wood v. President and Trustees of Spring Hill College in City of Mobile*, 978 F.2d 1214, 1219 (11th Cir.1992). No evidence of intentional discrimination has been provided in the case at hand. Based on the lack of proof of intentional discrimination, no compensatory damages would be available in this case under the Rehabilitation Act under its current interpretation, thus the court does not further address the availability of compensatory damages.

1995). In this case, it does not. The ACAA broadly prohibits airlines from discriminating against disabled individuals, but the statute itself does not specifically address the issues raised by Plaintiff in the Complaint. Thus, the court must move on to the next step in the *Chevron* analysis, which requires the court to determine "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778; *Dawson*, 50 F.3d at 886–87. The court in *Chevron* stated that:

> [t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778 (citations and footnotes omitted). The court in *Chevron* held that it is a well-settled principle that " ... [i]f [the agency's] choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, the court should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron*, 467 U.S. at 845, 104 S.Ct. 2778 (citing *United States v. Shimer*, 367 U.S. 374, 382–83, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)). Under the ACAA, the DOT is facing conflicting policies propounded by airlines and disability organizations. Prior to enacting the initial regulations, the DOT established a Federal Advisory Committee, which included representatives from the Paralyzed Veterans of America, the National Council on Independent Living, the American Council of the Blind, National Federation of the Blind, National Association of Protection and Advocacy Systems, National Association of the Deaf, the Society for Advancement of Travel for the Handicapped, the Air Transport Association, Regional Airline Association, National Air Carrier Association, National Air Transportation Association, Airport Operators Council International/American Association of Airport Executives, and the Association of Flight Attendants. 55 Fed.Reg. 8,009–10 (1990).

It is clear that Congress, in passing the ACAA, expressly provided the Secretary of Transportation the authority to promulgate regulations to implement the statute. Thus, the court will defer to the agency's interpretation of the statute. Title 14, Part 382 of the Code of Federal Regulations implements the ACAA.

Plaintiff sets forth only two arguments under 14 C.F.R. § 382. Defendant moves for summary judgment on both claims. First, Plaintiff argues that Defendant failed to provide an on-board aisle chair.[22] The governing regulation, 14 C.F.R. § 382.21(a)(4)(ii), requires the following:

> The carrier shall ensure that an operable on-board wheelchair is provided for a flight using an aircraft with more than 60 passenger seats on the request (with advance notice as provided in § 382.33(b)(8)) of a qualified individual with a disability who represents to the carrier that he or she is able to use an inaccessible lavatory but is unable to reach the lavatory from a seat without the use of an on-board wheelchair.

---

**22.** Pl.'s Brief, at 3.

The plane on which Plaintiff was flying was equipped with more than sixty seats.[23] The notice required by 14 C.F.R. § 382.33(b)(8) is as follows:

[a] carrier may require up to 48 hours advance notice and one-hour advance check-in concerning a qualified individual with a disability who wishes to receive any of the following services, types of equipment, or accommodations: [p]rovision of an on-board wheelchair on an aircraft that does not have an accessible lavatory.

A "qualified individual with a disability" is an "individual with a disability who,"

[w]ith respect to obtaining air transportation or other services or accommodations required by this part:

[p]urchases or possesses a valid ticket for air transportation on an air carrier and presents himself or herself at the airport for the purpose of traveling on the flight for which the ticket has been purchased or obtained; and

[m]eets reasonable, nondiscriminatory contract of carriage requirements applicable to all passengers.

14 C.F.R. § 382.5.

■ Based on the foregoing, the court must determine whether Plaintiff was a "qualified individual with a disability" and whether she provided the required notice. Defendant admits that Plaintiff is a paraplegic and unable to walk.[24] In addition, by admitting that Plaintiff was on the flight,[25] Defendant impliedly admits that Plaintiff had a ticket for the flight and presented herself at the airport for the purpose of traveling on the flight. Thus, the court finds that Plaintiff was a "quali-fied individual with a disability" at the time of the flight in question.

■ Next, the court must determine whether Plaintiff provided the advance notice required by 14 C.F.R. § 382.21(a)(4)(ii) and 14 C.F.R. § 382.33(b)(8). Plaintiff asserts that she notified Defendant of her "special needs," but the court is unaware of the content of the notification. Regardless, 14 C.F.R. § 382.33(c) provides that "[i]f a passenger does not meet advance notice or check-in requirements established by a carrier consistent with this section, the carrier shall nonetheless provide the service, equipment, or accommodation if it can do so by making a reasonable effort, without delaying the flight." Defendant claims to have placed an aisle chair on this plane,[26] and the court finds that provision of such equipment would require minimal effort. In addition, Defendant believed that 14 C.F.R. § 321.21 required that an aisle wheelchair be on board its aircraft.[27] Therefore, in this case, the court finds that any lack of advance notice by Plaintiff that Plaintiff needed an aisle chair to get to and from the inaccessible lavatory is excused because the court finds Defendant could make the accommodation with reasonable effort and without delaying the flight. Thus, the court finds that Defendant was required, to provide Plaintiff with an aisle chair to get to and from the airplane's inaccessible lavatory.

■ Conflicting evidence has been presented by the parties as to whether or not an aisle chair was requested or even available. Greg Carroll ("Carroll"), Program

---

23. Attachment 3 to Carroll Aff., showing diagram of MD–88 airplane.

24. Def.'s Mot. For Summ. J. And Supporting Br. ("Def.'s Brief"), at 1–2.

25. Def.'s Brief, at 1.

26. Carroll Affidavit, ¶ 5.

27. Def.'s Resp. To Pl.'s Mot. For Summ. J. ("Def.'s Resp."), at 3.

Manager—FAA NTSB Liasion of Defendant, testifies in his affidavit that: 1) an aisle wheelchair was installed in the aircraft on December 8, 1992; 2) that it is part of the standard and permanent equipment on the aircraft; 3) that checking the presence and condition of the onboard suitcase (presumably, aisle) wheelchair is a part of the normal course of inspections performed approximately every 40–45 days; 4) that the on-board equipment was inspected on April 16, 1998, and again on June 5, 1998, and that the on-board wheelchair was present on those dates.[28]

The court finds that Carroll's Affidavit and the documents upon which he relies still do not prove that an on-board wheelchair was on Plaintiff's flight on May 26, 1998. Defendant also submits the affidavit testimony of its flight attendant, Melinda Anne Wester ("Wester"). Wester testifies that she "first noticed a situation when [she] saw [Plaintiff] being carried by someone, whom [she] later learned to be [Plaintiff's] son, down the aisle of the plane;" and that she "would never have refused a request by [Plaintiff] or her son for an aisle chair, had such a request been made, which none was."[29] On the other hand, Plaintiff testified in her deposition that she asked a female flight attendant for an aisle chair, and was told that there was not one on the plane.[30] Plaintiff's son, Damon Love, testified in his affidavit that he asked the flight attendant for the "mover chair" that was used by the airline in getting his mother on board the plane, so that his mother could get to the restroom easily and quickly.[31] However, he testified, the flight attendant answered "that they did not have any chair on board that

we could use and she suggested that I carry my mother."[32] The court finds that the conflicting evidence as to the availability of an aisle chair creates a genuine issue of material fact, and therefore denies Defendant's Motion For Summary Judgment as it pertains to Plaintiff's claim that no available on-board aisle chair was provided.

**** Second, Plaintiff contends that under 14 C.F.R. § 382, Defendant failed to adequately train its flight personnel. Title 14 Part 382.61 of the Code of Federal Regulations governs the training of aircraft employees regarding interaction with disabled individuals. Carriers, such as Defendant in this action, are required

> for all ... personnel who deal with the traveling public ... to ensure training to proficiency concerning:
>
> ...
>
> The carrier's procedures, consistent with this part, concerning the provision of air travel to handicapped persons, including the proper and safe operation of any equipment used to accommodate handicapped passengers.
>
> The carriers shall also train such employees with respect to awareness and appropriate responses to handicapped persons, including persons with physical, sensory, mental, and emotional disabilities, including how to distinguish among the differing abilities of individuals with a disability.

14 C.F.R. § 382.61. Defendant alleges that it "trains its flight attendants in regard to the Americans With Disabilities Act and the Air Carriers Access Act," and flight

---

28. Carroll Aff., ¶¶ 5–7.

29. Wester Aff., ¶¶ 1, 5.

30. Dep. of Cynthia Love ("Love Depo."), at 62:1–3.

31. Affidavit of Damon Love ("Damon Love Aff.").

32. *Id.*

attendant training "is continuous and on an annual basis." [33] In addition, Defendant provides "Recurrent Training" documents in Exhibit 10 to its Motion For Summary Judgment and Supporting Brief. The documents are dated 1991, 1992, 1993, 1995, 1996. An additional document entitled "Regulations and Guidelines," dated 1998, is also provided. These documents provide support for Defendant's contentions that it trained its flight attendants.

However, Plaintiff testified in her deposition that the reaction of the female flight attendant, when told Plaintiff was ill and needed to go to the bathroom, was to inquire as to whether Plaintiff could walk.[34] Plaintiff answered no, and the flight attendant then allegedly asked Plaintiff how they were going to get Plaintiff to the bathroom.[35] As previously stated, Plaintiff then asked for an aisle chair, but was told that there was not one on the plane.[36] Plaintiff testified that the flight attendant "just didn't know how to do any of it or what to do next." [37] Plaintiff further testified that the flight attendant kept saying she didn't know what to do, that she did not know how to get Plaintiff to the restroom.[38] Plaintiff asserts in her deposition that "[t]hey didn't know what to do or how to get me [to the bathroom] and there was just no option." [39] As previously stated, Damon Love testified that when he requested the "mover chair", the flight attendant told him that there was not one on board that they could use and "suggested that [he] carry [his] mother." The court finds that the actions of the flight attendant, construed in a light most favor-able to Plaintiff, indicate a lack of adequate training. Thus, the court finds that the conflicting testimony regarding the training of flight attendants creates a genuine issue of material fact, and thus denies Defendant's Motion For Summary Judgment as to Plaintiff's claim that its flight personnel were inadequately trained.

For the sake of thoroughness, the court will also address, under the ACAA, Plaintiff's claims that 1) Defendant should have provided an accessible "call button" that Plaintiff could reach in order to page flight attendants, 2) Defendant should have provided an accessible restroom, and 3) Defendant should have provided Plaintiff with privacy in the restroom.

■ Plaintiff's argument that Defendant should have provided an accessible lavatory fails because the requirement of an aircraft to have an accessible lavatory has been considered by the United States Department Of Transportation ("DOT") in promulgating regulations pursuant to the ACAA. The aircraft in this case, and MD–88, had only one aisle.[40] In 14 C.F.R. § 382.21(a)(3), the DOT expressly requires only aircraft with more than one aisle to have accessible lavatories. Thus, Defendant was not required to provide the access to lavatories requested by Plaintiff in this case.

The same is true for Plaintiff's argument that Defendant failed to provide adequate privacy in the restroom. Such privacy is only required in aircraft with accessible lavatories. 14 C.F.R. § 382.21(a)(3). Thus, Defendant was not required to pro-

---

**33.** Aff. of Melinda Anne Wester In Supp. of Mot. For Summ. J. ("Wester Aff."), ¶ 5.

**34.** Love Depo., at 61:14–20.

**35.** *Id.,* at 62:23.

**36.** *Id.,* at 62:1–3.

**37.** *Id.,* at 62:6–7.

**38.** *Id.,* at 62:13–15.

**39.** *Id.,* at 62:16–19.

**40.** Carroll Aff., ¶ 4.

vide Plaintiff with the privacy requested by Plaintiffs in this case.

As no specific regulation has required the provision of an accessible, reachable "call button" for the disabled to more easily page flight attendants, Plaintiff's argument for call buttons would have to be made according to the regulation for General Prohibition Of Discrimination, 14 C.F.R. § 382.7, which requires an air carrier to "modify policies, practices, and facilities as needed to ensure non-discrimination, consistent with the standards of section 504 of the Rehabilitation Act, as amended." 14 C.F.R. § 382.7(c). "Carriers are not required[,] [however,] to make modifications that would constitute an undue burden or would fundamentally alter their program." *Id.* On March 4, 1998, the DOT clarified what it meant in its "general nondiscrimination obligations of carriers." 63 Fed.Reg. 10,528. The DOT stated that "[t]here is no basis for asserting that the only modifications a carrier could ever be required to make are those specifically enumerated in the existing sections of the rule." *Id.* at 10,529. However, the DOT also noted that "both carriers and disability groups [agree] that, under section 504, carriers are not required to make modifications that would constitute an undue burden or fundamentally alter the nature of the carriers' service." *Id.* Thus, "[i]n assessing any requested accommodation, passengers, airlines, and the Department must exercise judgment on a case-by-case basis concerning what it is reasonable to expect and what constitutes an undue burden." *Id.* at 10,530.

Perhaps the most significant statement by the DOT relating to the issue of providing accessible and reachable call buttons is the following:

[t]his provision is not intended to replace the rulemaking process with respect to across-the-board changes in carrier policies and practices. For example, the Department does not intend, in implementing and enforcing this provision, to address industry-wide issues like onboard oxygen use by passengers, additional accommodations for passengers with hearing impairments, or smoking in airports. The provision is intended to deal with accommodations that take the form of case-by-case exceptions to otherwise reasonable general policies or practices of carriers.

*Id.* The court finds that requiring Defendant to provide accessible, reachable call buttons that would allow disabled passengers to more easily page flight attendants is an "industry-wide issue" which would require going through the rulemaking process of the DOT. Thus, the court finds that Plaintiff's argument that Defendant should have provided an accessible, reachable call button for Plaintiff is better left to the policy determinations of either the legislature or the DOT, and therefore finds that Plaintiff's argument, as the law currently stands, has no merit.

## V. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendant's Motion For Summary Judgment be and the same is hereby GRANTED as to Plaintiff's claims under the Air Carrier Access Act that 1) a reachable call button should have been provided that would have allowed Plaintiff to page flight attendants 2) an accessible restroom should have been provided and 3) privacy should have been provided in the restroom, and DENIED in all other respects.

It is further CONSIDERED and ORDERED that Plaintiff's claims under the Americans With Disabilities Act be and the same are hereby DISMISSED, and that Plaintiff's claims under the Air Carrier Access Act for compensatory and pu-

nitive damages and attorney's fees and expenses be and the same are hereby DISMISSED.

It is CONSIDERED and ORDERED that Plaintiff's Motion For Summary Judgment be and the same is hereby DENIED.